IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RAVEN WILLIAMS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 15-0123-WS-N |
| ) | |
| ROBERT W. OMAINSKY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

This matter comes before the Court on defendants' Motion to Dismiss and Compel Mediation/Arbitration (doc. 60) as to the claims of opt-in plaintiffs Courtney Booth, Morgan Wade, Allison Odom, Dante' Henry, Christina Guess and Stormy Lord, and on defendants' substantively identical Motion to Dismiss and Compel Mediation/Arbitration (doc. 74) as to the claims of opt-in plaintiff Rebecca Glynn Smith. The Motions have been thoroughly briefed and are now ripe for disposition.[1]

**I.    Relevant Background.**

Plaintiffs are current or former servers employed by defendants, Robert W. Omainsky and Fried Stewed Nude, Inc., at Wintzell's Oyster House restaurant locations in Downtown Mobile, Alabama and/or Saraland, Alabama. Per well-pleaded allegations of the Complaint, plaintiffs maintain that defendants violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et*

---

[1] A pair of notes about the briefing is appropriate from the outset. First, movant's Reply (doc. 70) exceeds without leave the 15-page limitation prescribed by the Local Rules, and is therefore subject to being stricken. *See* Civil L.R. 7(e). In its discretion, however, the Court will consider the Reply in its present form to prevent the additional delay and expense that would result from striking the Reply and ordering re-briefing. Second, defendants' Motion to Dismiss/ Compel relating to opt-in plaintiff Smith seeks relief on the same grounds and for the same reasons as its Motion to Dismiss/Compel filed with respect to other opt-in plaintiffs. Plaintiffs have submitted a separate Response (doc. 77) to the Smith Motion; however, except as may be expressly stated herein, the Smith Motion analysis is identical to that of its colleague, and both Motions will be addressed contemporaneously.

*seq*. ("FLSA"), by failing to pay plaintiffs minimum wage, operating an invalid tip-sharing arrangement, and claiming the tip credit for time that plaintiffs spent performing non tip-producing duties.  Plaintiffs brought their Complaint on their own behalf, and on behalf of similarly situated servers who may opt in upon notice pursuant to the "collective action" provisions found at 29 U.S.C. § 216(b).[2]

Certain other present and former Wintzell's servers have signed and filed "Consent to Join Collection Collective Action Forms" in this action, including Courtney Booth, Dante' Henry, Morgan Wade, Allison Odom, Christina Guess, Stormy Lord and Rebecca Glynn Smith. (*See* docs. 51, 55, 56, 58, 71.)  Each individual's opt-in form is signed and dated, confirms that the individual is or was working at Wintzell's Oyster House as a server at a designated location, indicates that the person was paid $2.25 per hour even when performing non-serving duties and was required to participate in a purportedly invalid tip pool, and states the person's consent to join in this FLSA action and to be represented by plaintiffs' counsel of record.  (*Id.*)

The hitch is that those seven opt-in plaintiffs (collectively, the "Opt-Ins") all signed identical Employment Arbitration Agreements between March 12 and March 16, 2015.  (*See* Omainsky Decl. (doc. 59, Exh. A), at Exhs. A-3, A-4, A-5, A-6, A-7; doc. 60, Exh. B; doc. 74, Exh. A.)  The four-page preprinted Agreement includes the following language:

> "As a condition of your employment at [Fried Stewed Nude, Inc.], you agree that any controversy or claim arising out of or relating to your employment relationship with FSN or the termination of that relationship, must be submitted for non-binding mediation before a third-party neutral and (if necessary) for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and FSN."

(Omainsky Decl, Exh. A-3, at 1.)  With a few exceptions, this mediation / arbitration agreement on its face covers all "claims for violation of any federal, state or other governmental law, statute, regulation or ordinance."  (*Id.* at 2.)  As to the arbitration portion of the dispute resolution procedure, the Agreement specifies that "[t]he arbitration will be conducted under the

---

[2] *See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008) ("The FLSA authorizes collective actions against employers accused of violating the FLSA. … Participants in a § 216(b) collective action must affirmatively opt in to the suit."); 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

Employment Dispute Resolution Rules of the AAA … (A copy of the complete AAA Employment Dispute Resolution Rules may be obtained from www.adr.org.)" (*Id.* at 2-3.) Other relevant aspects of the Agreement include the following: (i) a statement that "[a]ny conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement;" (ii) a provision that "[t]he arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law, including … the Fair Labor Standards Act;" (iii) a requirement that "[y]ou and FSN agree to bring any covered claim on an individual basis only, and not on a collective or class action basis;" and (iv) a cost-sharing term under which the parties "agree to share equally the AAA administrative fees and the arbitrator's fees and expenses," with each party to bear his, her or its own attorney's fees. (*Id.* at 3.)

Defendants now seek to enforce the Employment Arbitration Agreements against the Opt-Ins. Specifically, defendants request that the seven Opt-Ins be dismissed from this litigation and compelled to pursue their claims against Omainsky and FSN on an individualized basis via mediation/arbitration in accordance with the terms of such Agreements. For their part, the Opt-Ins argue that the Agreements are substantively and procedurally unconscionable on multiple grounds, such that this Court should reject the Agreements as invalid and unenforceable.

**II.     Analysis.**

   *A.     Governing Legal Standard.*

The Federal Arbitration Act ("FAA"), which governs defendants' Motions, provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In conformity with the FAA, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (citations omitted). "Arbitration is a matter of contract" and "interpretation of an arbitration agreement is generally a matter of state law." *In re Checking Account Overdraft Litigation MDL No. 2036*, 674 F.3d 1252, 1255 (11th Cir. 2012). "Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v.*

*AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) (citation and internal quotation marks omitted).

Significantly, the FAA creates a strong federal policy favoring enforcement of arbitration agreements. Indeed, "federal courts interpret arbitration clauses broadly where possible," such that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 988 (11th Cir. 2012) (citations omitted); *see also Inetianbor*, 768 F.3d at 1353 ("When interpreting an arbitration agreement, due regard must be given to the federal policy favoring arbitration, and ambiguities to the scope of the arbitration clause itself resolved in favor of arbitration.") (citation and internal quotation marks omitted). As the Eleventh Circuit has observed, the FAA "sets forth a clear presumption – 'a national policy' – in favor of arbitration." *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015). Of course, "the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).

### B. Whether Court or Arbitrator Decides Arbitrability.

As noted, the Opt-Ins' position is that their present dispute is not arbitrable because the Agreements are invalid, based on the terms of such Agreements and the circumstances of their execution. The obvious threshold question is whether this Court or an arbitrator should resolve those objections. As a general proposition, "whether the parties have a valid arbitration agreement at all is for the court, not the arbitrator, to decide." *Terminix Int'l Co. v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327, 1331 (11th Cir. 2005) (citation and internal quotation marks omitted); *see also U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) ("ordinarily, the question of arbitrability is undeniably an issue for judicial determination unless the parties clearly and unmistakably provide otherwise") (citation and internal marks omitted). There is an exception, however. Questions of arbitrability are for the arbitrator to decide, where there is "clear and unmistakable evidence that the parties intended the arbitrator to rule on the validity of the arbitration agreement itself." *Terminix*, 432 F.3d at 1331 (citations and internal quotation marks omitted); *see also AT & T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); *Chambers v.*

*Groome Transp. of Alabama*, 41 F. Supp.3d 1327, 1336 (M.D. Ala. 2014) ("Parties may delegate, therefore, the authority to rule on gateway arbitrability issues to the arbitrator without running afoul of the FAA or case law … And courts should enforce valid delegation provisions as long as there is 'clear and unmistakable' evidence that … the parties manifested their intent to arbitrate a gateway question.") (citations and internal marks omitted).

Where an arbitration agreement incorporates rules conferring authority upon an arbitrator to decide gateway questions, the Eleventh Circuit has found clear and unmistakable evidence that the parties have contracted around the default rule that the court (rather than an arbitrator) must adjudicate objections to the validity of the arbitration agreement. *See U.S. Nutraceuticals*, 769 F.3d at 1311 ("When the parties incorporated into the 2007 contract the rules of the Association, they clearly and unmistakably contracted to submit questions of arbitrability to an arbitrator.").[3]

Defendants' position is that all of the Opt-Ins' objections to the validity of the Agreements must be referred to – and decided by – the arbitrator pursuant to the *U.S. Nutraceuticals* line of authority. As clear and unmistakable evidence that the parties intended to delegate such issues to the arbitrator, defendants point out that the Agreements provide that "[t]his agreement to submit to mediation and (if necessary) for final and binding resolution by a private and impartial arbitrator … [c]overs any dispute concerning the arbitrability of any such

---

[3] *See also Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of [AAA rules into an arbitration agreement] presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.") (citations omitted); *Terminix*, 432 F.3d at 1332-33 ("By incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid. … In the ordinary case, we would decide these questions only because they go to the validity of the arbitration clause itself, which is by default an issue for the court, not the arbitrator. Here, however, the parties have contracted around that default rule …."); *Southland Health Services, Inc. v. Bank of Vernon*, 887 F. Supp.2d 1158, 1167 (N.D. Ala. 2012) ("The arbitration agreements here clearly demonstrate the parties' intent to empower the arbitrator with the authority to determine his own jurisdiction. Each agreement states that it is subject to the rules of the AAA. … Because the agreements empower the arbitrator to determine jurisdiction, this Court is bound by its obligation to rigorously enforce agreements to arbitrate.") (citation and internal quotation marks omitted); *Knowles v. Community Loans of America, Inc.*, 2012 WL 5868622, *2 (S.D. Ala. Nov. 20, 2012) ("One way to show a clear and unmistakable intent to arbitrate arbitrability is by agreeing that the arbitration will be conducted in accordance with formalized arbitration rules, which rules provide for arbitration of arbitrability.").

controversy or claim." (Doc. 59, Exh. A-3, at 1.) Moreover, the Agreements provide that "[t]he arbitration will be conducted under the Employment Dispute Resolution Rules of the AAA." (*Id.* at 2.) Defendants then cite Section 6(a) of the American Arbitration Association's "Employment Arbitration Rules and Mediation Procedures" (as amended and effective November 1, 2009), which reads as follows: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[4]

The Opt-Ins devote the bulk of their response to the Motions to Dismiss/Compel to a critique of the Agreements as being substantively and procedurally unconscionable.[5] Pursuant to the foregoing discussion, however, the Court cannot reach any of those arguments if the Agreements reflect the parties' clear and unmistakable intent to have the arbitrator decide threshold disputes concerning such gateway matters as validity and arbitrability. Defendants have made a compelling showing of such clear and unmistakable intent being expressed in the text of the Agreement, through both the delegation clause and the express incorporation of AAA

---

[4] No party has submitted a set of these rules as exhibits in briefing the Motion to Dismiss and Compel Mediation / Arbitration; however, the content of those rules appears not to be in dispute and may be readily confirmed by visiting www.adr.org, as the Eleventh Circuit and district courts in this Circuit have routinely done in similar circumstances. *See, e.g., Terminix*, 432 F.3d at 1332 (citing www.adr.org as source in identifying and quoting specific AAA rules incorporated into parties' arbitration agreement for purposes of ascertaining whether parties had clearly and unmistakably agreed that arbitrator should decide validity of arbitration clause).

[5] Specifically, the Opt-Ins object that the Agreements violate the FLSA by including a waiver provision under which claims are waived unless written notice is provided within one year after such they arise, as compared to the two-year (or, in the case of willful violations, three-year) limitations period prescribed by the FLSA. (Doc. 68, at 11-12.) They further argue that the costs of arbitration (which the Agreements provide must be shared equally by the parties) are prohibitively high for the Opt-Ins, who are restaurant workers of limited means and, in many instances, difficult personal financial circumstances. (*Id.* at 12-13.) Additionally, the Opt-Ins take aim at the Agreements for requiring them to bear their own costs and attorney's fees, which the Opt-Ins characterize as being in conflict with the FLSA's fee-shifting scheme. (*Id.* at 14-17.) And the Opt-Ins balk that the Agreement is procedurally unconscionable because defendants exerted disproportionate bargaining power, defendant Omainsky did not sufficiently explain the content and import of the Agreements, at least one Opt-In felt pressured to sign, servers were not informed that they could keep their jobs even if they declined to execute the Agreement, and defendants rolled out the Agreements as a response to the filing of this lawsuit. (*Id.* at 17-21.)

rules empowering the arbitrator to rule on his or her own jurisdiction, including objections to the existence or validity of the arbitration agreement. Binding and persuasive authorities alike (including *Terminix* and its progeny) have consistently and rigorously enforced such provisions, which is precisely what Omainsky and Fried Stewed Nude request in their Motions to Dismiss / Compel.

Nonetheless, the Opt-Ins dispute defendants' contention that the Agreements clearly and unmistakably provide that objections to validity / arbitrability are to be decided by the arbitrator. Plaintiffs' primary argument is that the Agreements do not actually incorporate rules because they reference "Employment Dispute Resolution Rules of the AAA," but no such rules may be found. In this regard, the Opt-Ins are correct that the American Arbitration Association ("AAA") has no rules bearing that precise name. However, their attempt to parlay the Agreements' imprecise identification of the applicable rules into an ambiguity negating any clear, unmistakable agreement to have the arbitrator decide gateway validity / arbitrability issues is unavailing for at least two reasons. First, the AAA has a set of rules entitled "Employment Arbitration Rules and Mediation Procedures," which is (i) strikingly similar in title to the Agreements' reference to "Employment Dispute Resolution Rules of the AAA," and (ii) the only active set of AAA rules whose title bears any resemblance to the specific set of rules referenced in the Agreements. No reasonable reading of the Agreements could support a conclusion that they intended to incorporate anything other than the "Employment Arbitration Rules and Mediation Procedures" of the AAA. There is no confusion, no ambiguity, and no contractual disconnect created by the modest, inconsequential divergence of the formal name used in the Agreement as compared to the precise title of the rules found on the AAA website.[6]

---

[6] The Opt-Ins attempt to manufacture such ambiguity by suggesting that the Agreements might have been referencing the "National Rules for Resolution of Employment Dispute amended and effective January 1, 2004." (Doc. 68, at 8.) However, that set of rules no longer exists, having been absorbed and superseded by the AAA's Employment Arbitration Rules and Mediation Procedures. *See* Employment Arbitration Rules and Mediation Procedures, § 1 ("The National Rules for the Resolution of Employment Disputes have been re-named the Employment Arbitration Rules and Mediation Procedures. Any arbitration agreements providing for arbitration under its National Rules for the Resolution of Employment Disputes shall be administered pursuant to these Employment Arbitration Rules and Mediation Procedures."). Furthermore, that same section of the Rules confirms that the Employment Arbitration Rules and Mediation Procedures are made part of a parties' arbitration agreement whenever the agreement
(Continued)

Second, and more fundamentally, even if the Opt-Ins were correct (and they are not) that the Agreements' failure to use the exact name of the applicable AAA rules creates confusion as to which (if any) rules apply, the Agreements contain a separate delegation clause.  In that provision, the Opt-Ins agree that for any controversy or claim arising from their employment relationship with Fried Stewed Nude, "[t]his agreement to submit to mediation and (if necessary) arbitration … [c]overs any dispute concerning the arbitrability of any such controversy or claim." (Doc. 59, Exh. A-3 at 1.)[7]  On its face, this provision constitutes clear, unmistakable evidence that the parties intended for the arbitrator to decide disputes concerning the validity or enforceability of the Agreement.  Delegation provisions are routinely enforced, and the underlying disputes referred to an arbitrator, absent a specific challenge to the delegation provision itself.  *See, e.g., Parnell*, 804 F.3d at 1146-47 ("In sum, absent a challenge to the delegation provision itself, the federal courts must treat the delegation provision as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator.") (citations and internal quotation marks omitted).  The Opt-Ins fail to address, challenge or impugn that delegation clause.  As such, this Court is bound

---

provides "for arbitration by the AAA of an employment dispute without specifying particular rules."  (*Id.*)  Simply put, all roads lead back to the Employment Arbitration Rules and Mediation Procedures of the AAA, and the Agreements' failure to use that exact title in no way creates confusion, ambiguity or uncertainty as to whether those rules apply or whether the parties might have intended to incorporate some other or different rules into their Agreements.  Thus, the circumstances here are strikingly and materially dissimilar from those described in the authority on which the Opt-Ins rely.  *Compare Chambers*, 41 F. Supp.3d at 1337-38 ("The principal point of ambiguity is that the Arbitration Agreement does not provide for the application of the AAA's *arbitration* rules at all, but rather its *mediation* rules, with governance by a *mediator*, not an *arbitrator*.").  Here, the parties' Agreement could not rationally be construed as adopting anything other than the Employment Arbitration Rules and Mediation Procedures of the AAA, so there is no uncertainty as to the parties' intent.

[7]   It is well settled that "'[q]uestion[s] of arbitrability' thus include questions ***regarding the existence of a legally binding and valid arbitration agreement***." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 78, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010) (emphasis added).  The Opt-Ins' objections that the Agreements are unconscionable and invalid clearly fall under the umbrella of "questions of arbitrability" and thus lie squarely within the parameters of the delegation clause, which applies to "any dispute concerning … arbitrability."

under *Parnell* to treat the delegation provision as valid and enforce it, leaving the Opt-Ins' numerous challenges to the validity of the Agreement as a whole for the arbitrator to resolve.

Their efforts to conjure ambiguity from the title of the applicable AAA rules having failed, the Opt-Ins offer a fallback argument that there is a material inconsistency between the AAA Employment Arbitration Rules and Mediation Procedures, on the one hand, and the Agreements, on the other. (Doc. 68, at 8-9.) In particular, the Opt-Ins rely on a discrepancy between the AAA rules and the Agreements as to which one governs in the event of an inconsistency. The AAA rules state, "If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." (Employment Arbitration Rules and Mediation Procedures, § 1.) By contrast, the Agreements provide that "[a]ny conflict between the rules and procedures set forth in the AAA rules and those set forth in the Agreement shall be resolved in favor of those in this Agreement." (Doc. 59, Exh. A-3, at 3.) It is undoubtedly correct that these provisions are in conflict; however, the Opt-Ins fail to explain how that discrepancy negates, undermines or otherwise bears on the delegation clause or the adoption of the AAA rule empowering the arbitrator to resolve objections to the existence, scope or validity of the arbitration agreement. Nothing in the Opt-Ins' identified tension between the Agreements and the AAA rules operates to cast doubt on whether the parties delegated to the arbitrator the responsibility to decide all issues pertaining to enforceability and validity of the Agreement. Certainly, nothing in either the Agreements or the AAA rules suggests that the arbitrator lacks such authority; indeed, both expressly confer such authority upon the arbitrator. As such, there is no material conflict between the two documents that bears on the delegation clause or the reference to the AAA rules, such that the cited discrepancy might be brought to the fore as to whether Agreements or AAA rules govern. On this point, at least, both the Agreements and the rules appear aligned.

Simply put, the Opt-Ins and Fried Stewed Nude clearly and unmistakably agreed to submit to the arbitrator any disputes concerning arbitrability (including those bearing on the existence, scope and validity of the Agreements). Neither the imprecise identification of the AAA rules in the Agreements nor the discrepancy between the AAA rules and the Agreements as to which one governs in the case of an inconsistency creates any meaningful doubt as to the parties' delegation of arbitrability issues to the arbitrator. The Opt-Ins' criticisms of the Agreements as being substantively and procedurally unconscionable are thus reserved for the

arbitrator, not for a federal court, to decide.  Accordingly, the Court does not reach the merits of plaintiffs' unconscionability objections.  Instead, the Court will enforce the parties' clear and unmistakable agreement that the arbitrator shall resolve arbitrability objections and decide the existence, scope or validity of the arbitration agreement.[8]

---

[8] One point of clarification is appropriate.  Certainly, ample authority generally supports the proposition that where a party claims fraud in the inducement of an arbitration clause, the court rather than the arbitrator should decide that question.  *See, e.g., Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (if a party alleges "fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it."); *Southland Health*, 887 F. Supp.2d at 1167-68 ("Plaintiffs' only chance of avoiding arbitration would be to allege fraud in the procuring of the arbitration agreement itself, or else to challenge its very existence."); *Caseres v. Texas de Brazil (Orlando) Corp.*, 2013 WL 5921539, *5 (M.D. Fla. Nov. 4, 2013) ("if a claim of fraudulent inducement relates to the arbitration agreement itself, then a court should resolve the issue").  At various points in their briefing, the Opt-Ins allude to (but develop in only cursory, skeletal fashion) a theory of fraudulent inducement in their execution of the Agreements because defendant Omainsky allegedly never told them that signing was optional or that they could keep their jobs even if they elected not to sign.  (*See* doc. 68, at 9 & 19 n.13.)  Any contention by the Opt-Ins that this Court must decide their fraud in the inducement challenge before referring the matter to arbitration fails as a matter of law.

The Supreme Court has opined that "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Rent-A-Center*, 561 U.S. at 70.  "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4."  *Id.* at 71.  However, courts "require the basis of the challenge to be directed specifically to the agreement to arbitrate [*i.e.*, not to the larger contract as a whole] before the court will intervene."  *Id.; see also Parnell*, 804 F.3d at 1144 ("We hold that when a plaintiff seeks to challenge an arbitration agreement containing a delegation provision, he or she must challenge the delegation provision directly.").  Thus, the *Rent-A-Center* Court concluded that arbitrability issues were for the arbitrator to decide where the plaintiff's challenges were directed to the entire agreement (itself an arbitration agreement) rather than the specific delegation clause (which the Supreme Court's analysis treated as a separate, distinct arbitration agreement for FAA purposes).  561 U.S. at 72 ("Section 2 operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce.  Accordingly, unless Jackson challenged the delegation provision specifically, we must … leav[e] any challenge to the validity of the Agreement as a whole for the arbitrator.").  "When an arbitration agreement contains a delegation provision and the plaintiff raises a challenge to the contract *as a whole*, the federal courts may not review his claim because it has been committed to the power of the arbitrator."  *Parnell*, 804 F.3d at 1146.  That is precisely the case here.

### C. *Dismissal or Stay: The Mechanics of the Mediation / Arbitral Proceedings.*

The only remaining question is what happens next.  Fried Stewed Nude and Omainsky urge the Court to dismiss (rather than stay) all of the Opt-Ins' claims pending arbitration, on the grounds of judicial economy.  (*See* doc. 60, at 17.)  Plaintiffs have the better argument on this point.  The text of the FAA itself provides that when a court determines an issue is referable to arbitration under an arbitration agreement, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had ...."  9 U.S.C. § 3.  Furthermore, as the undersigned has noted previously, "[w]here a plaintiff initiates litigation without satisfying arbitration requirements, courts routinely stay rather than dismiss the proceedings to allow for implementation of the agreed-upon dispute resolution mechanism." *Campbell v. Pilot Catastrophe Services, Inc.*, 2010 WL 3306935, *7 (S.D. Ala. Aug. 19, 2010) (collecting cases).  The wisdom of those general principles is amplified where, as here, the Opt-Ins have raised "multiple threshold challenges [that] the arbitrator must resolve favorably to the defendants before even reaching the merits of the dispute, and the corresponding possibility [that the Opt-Ins] ultimately will be permitted to pursue litigation," and where "a dismissal would implicate statute of limitations considerations." *Knowles v. Community Loans of America, Inc.*, 2012 WL 5868622, *5 (S.D. Ala. Nov. 20, 2012).  Because of these concerns, and defendants' failure to articulate any countervailing reason why dismissal might be more appropriate than a stay in these circumstances, the Opt-Ins' claims will be stayed, not dismissed, pending the outcome of mediation/arbitration.[9]

### III. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendants' Motion to Dismiss and Compel Mediation/Arbitration (doc. 60) as to the claims of opt-in plaintiffs Courtney Booth, Morgan Wade, Allison Odom,

---

[9] Plaintiffs devote a portion of their brief to debating the content, scope and form of the notice that should be furnished to prospective opt-in plaintiffs if conditional certification is granted.  (*See* doc. 68, at 24-27.)  Plaintiffs' Motion for Conditional Certification and Court-Facilitated Notice (doc. 30) has been the subject of extensive, separate briefing and will be resolved via separate Order.  Moreover, a ruling on motions to compel arbitration is not the appropriate vehicle to nail down the particulars of a court-facilitated notice that may issue if a motion for conditional certification is subsequently granted; therefore, the Court declines plaintiffs' invitation to tackle those questions here.

|   |   |
|---|---|
|   | Dante' Henry, Christina Guess and Stormy Lord is **granted in part, and denied in part**; |
| 2. | Defendants' Motion to Dismiss and Compel Mediation/Arbitration (doc. 74) as to opt-in plaintiff Rebecca Glynn Smith is **granted in part, and denied in part**; |
| 3. | Both Motions are **denied** insofar as they seek outright dismissal of the claims of the enumerated opt-in plaintiffs; |
| 4. | The Motions are **granted** insofar as they seek to compel mediation and (if necessary) arbitration of those claims of those listed opt-in plaintiffs; |
| 5. | All claims brought in this litigation by opt-in plaintiffs Courtney Booth, Morgan Wade, Allison Odom, Dante' Henry, Christina Guess, Stormy Lord and Rebecca Glynn Smith are **stayed pending the results of mediation/arbitration**; |
| 6. | Notwithstanding this determination, the Court retains jurisdiction to confirm or vacate any resulting arbitration award under 9 U.S.C. §§ 9-10.  *See TranSouth Financial Corp. v. Bell*, 149 F.3d 1292, 1297 (11th Cir. 1998).  To enable the Court to monitor the progress of these claims as they move through the mediation/arbitration processes, the parties are **ordered** to file, on or before the **first Thursday of each month**, beginning in **January 2016**, a joint written report reflecting the status of the mediation/arbitration proceedings; and |
| 7. | This litigation shall move forward as to the claims of all other original and opt-in plaintiffs. |

DONE and ORDERED this 3rd day of December, 2015.

> s/ WILLIAM H. STEELE
> CHIEF UNITED STATES DISTRICT JUDGE