IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RAVEN WILLIAMS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION 15-0123-WS-N |
| | ) |
| ROBERT W. OMAINSKY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

This matter comes before the Court on plaintiffs' Motion for Conditional Certification and Court-Facilitated Notice (doc. 30), plaintiffs' Motion for Curative Provision in the Notice (doc. 78), and defendants' Motion to Strike (doc. 85). All Motions are ripe for disposition.[1]

**I.    Procedural Posture.**

   ***A.    Nature of Plaintiffs' Claims.***

The named plaintiffs are current or former servers employed by defendants, Robert W. Omainsky and Fried Stewed Nude, Inc., at Wintzell's Oyster House restaurant locations in Downtown Mobile, Alabama, and Saraland, Alabama.[2] The gravamen of the Complaint is that

---

[1]     The Motion to Strike may be resolved expeditiously. Plaintiffs filed their Motion for Curative Provision on November 24, 2015. By operation of Civil L.R. 7(c) & (d) and Rule 6(d), Fed.R.Civ.P., defendants' response was due on or before December 11, 2015, and plaintiffs' reply was to be filed on or before December 21, 2015. Plaintiffs did not file their Reply (doc. 84) until December 28, 2015, four business days late. On that basis, defendants move to strike the Reply. To be sure, the Reply was untimely and plaintiffs should have submitted an accompanying motion to accept out-of-time filing to explain their dilatoriness and obtain judicial permission for the tardy submission. But the sanction of striking the Reply is excessive here, given that plaintiffs' delay – while initially unexplained and improper – neither prejudiced defendants nor (in light of intervening holiday closings) appreciably hampered the Court's ability to adjudicate the underlying Motion for Curative Provision in a prompt and efficient manner. Accordingly, the Motion to Strike Plaintiffs' Reply (doc. 85) is **denied**.

[2]     Plaintiffs' Amended Complaint (doc. 4) included an additional defendant (Wintzell's, Inc.) and appeared to expand the scope of their claims to all 11 Wintzell's Oyster (Continued)

defendants operated an invalid tip pool and improperly claimed the tip credit for time that plaintiffs spent performing non tip-producing work, all in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA").

In their Motion for Conditional Certification, plaintiffs elaborate on their FLSA claim as follows: Although the FLSA generally establishes a minimum hourly wage of $7.25, employers may claim a "tip credit" by paying tipped employees a cash wage up to $5.12 per hour below that minimum wage, as long as certain conditions are satisfied. One such requirement is that "all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m). In a nutshell, plaintiffs' FLSA cause of action is that defendants "have consistently required servers to share tips with non-tipped employees," namely dishwashers, rendering the tip pool invalid, such that defendants could not properly claim a tip credit for servers and "Defendants are thus liable for the difference between the reduced cash wage it paid them and the minimum wage required by … law." (Doc. 30, at 22, 25.) For their part, defendants deny that their tip pool arrangement was improper. In particular, defendants' position is that the tip pool was valid because servers were required to share tips with bussers, rather than dishwashers. (Doc. 59, at 7-8, 15-18.)[3]

---

House restaurants, including locations in Fairhope, Greenville, Guntersville, Huntsville, Montgomery, Orange Beach, Spanish Fort, West Mobile, and Pittsburgh, Pennsylvania. All claims against Wintzell's, Inc. were dismissed on settlement (*see* doc. 79) via Order entered on November 24, 2015. Plaintiffs now confine their request for conditional certification to just three Wintzell's Oyster House locations (Downtown Mobile, Saraland, West Mobile), as those are the only three locations owned by the remaining defendants (Fried Stewed Nude and Omainsky).

[3]       At the risk of oversimplification, the Court observes that a reasonable reading of the parties' briefs on the conditional certification issue suggests that the heart of their dispute over FLSA liability lies in the factbound, objective question of whether dishwashers were or were not included in the tip pool. After all, defendants concede that "[t]hose employees whose primary duties are dishwashers … are not permitted to participate in a required tip pool" under the FLSA. (Doc. 59, at 18.) But plaintiffs insist that "[t]he customarily 'non-tipped' employees with whom Defendants' servers were required to share tips included employees functioning as dishwashers in Defendants' restaurants." (Doc. 30, at 22; *see also* doc. 65, at 9 ("Plaintiffs have made a substantial showing that the tip pool at Defendants' restaurants impermissibly included non-tipped employees …. Specifically, Plaintiffs have submitted evidence that the tip pool (Continued)

###### B.    *The Employment Arbitration Agreements.*

Of central importance to the pending Motions are Employment Arbitration Agreements executed in March 2015 by some 75 servers (all of whom are prospective opt-in plaintiffs) employed by defendant Fried Stewed Nude, Inc. at Wintzell's Oyster House restaurants in Downtown Mobile, Saraland and West Mobile.  (R. Omainsky Decl. (doc. 59, Exh. A), ¶¶ 41, 57.)  In relevant part, those Agreements specified as follows:

> "As a condition of your employment at [Fried Stewed Nude, Inc.], you agree that any controversy or claim arising out of or relating to your employment relationship with FSN or the termination of that relationship, must be submitted for non-binding mediation before a third-party neutral and (if necessary) for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and FSN."

(R. Omainsky Decl., Exh. A-3, at 1.)

Such Agreements were not executed by <u>all</u> Fried Stewed Nude servers at those locations; to the contrary, "at least eight servers refused to sign the Employment Arbitration Agreement and were not terminated."  (*Id.*, ¶ 46.)  Likewise, servers who had previously worked for Fried Stewed Nude but who had resigned or been terminated prior to March 2015 never signed such an Agreement either.  Thus, a substantial number of prospective opt-in plaintiffs never signed arbitration agreements here.

However, seven would-be opt-in plaintiffs (Courtney Booth, Dante' Henry, Morgan Wade, Allison Odom, Christina Guess, Stormy Lord and Rebecca Glynn Smith) signed the FSN Employment Arbitration Agreement.  After these individuals filed consent forms to join this action, defendants filed Motions to Dismiss and Compel Mediation/ Arbitration (docs. 60 & 74), seeking to enforce the ADR provisions of those Agreements as to each of these seven opt-in plaintiffs.  In opposing FSN's efforts to enforce those mediation/arbitration requirements, plaintiffs railed against the Agreements as being both substantively and procedurally

---

included individuals who worked as dishwashers. … Defendants do not directly address the tipping of 'dishwashers.'".)  Given the apparent centrality of this narrow fact issue to their respective litigation stances, the parties would be well-advised to scrutinize closely and candidly the evidence as to whether dishwashers were or were not included in the Fried Stewed Nude tip pool.  Engaging in such a clear-eyed, searching analysis at an early stage may facilitate a frank, realistic evaluation of each party's respective prospects, likelihood of success, and best litigation options and strategies going forward.

unconscionable.[4]  The Court entered an Order (doc. 82) on December 3, 2015, finding that the terms of both the Agreements and the AAA Rules incorporated therein required threshold determinations as to validity, scope and enforceability of the Agreements to be made by an arbitrator, not a federal court.[5]  On that basis, the December 3 Order compelled mediation and (if necessary) arbitration of all claims brought by the seven affected opt-in plaintiffs.  That process is now underway.  Although defendants requested that the seven affected opt-in plaintiffs' claims be dismissed, the Court declined to do so, but instead stayed those claims, based on (i) the text of the Federal Arbitration Act, (ii) the abundance of case authorities that stay (rather than dismiss) claims in analogous circumstances, (iii) the pendency of multiple threshold challenges that might prevent the arbitrator from ultimately deciding (or even reaching) the merits of the FLSA claim, and (iv) the potential repercussions of such a time lapse for the relevant limitations period governing the opt-in plaintiffs' claims.  (Doc. 82, at 11.)

The net result of the December 3 Order, then, is that the claims of opt-in plaintiffs Courtney Booth, Morgan Wade, Allison Odom, Dante' Henry, Christina Guess, Stormy Lord and Rebecca Glynn Smith were stayed pending the results of mediation and (if appropriate) arbitration.  The arbitrator(s) will be tasked with making certain threshold determinations as to the arbitrability disputes (*i.e.*, the validity, scope and enforceability of the Employment Arbitration Agreements).  Depending on the outcome of those proceedings, it is entirely possible that one or more opt-in plaintiffs may rejoin this litigation (that is, have the stay of his or her

---

[4]     Specifically, plaintiffs objected that the Agreements were (i) violative of the FLSA because they included a waiver provision under which the employee's claims were waived if not pursued within one year, whereas the FLSA has a two-year (or, as to willful violations, three-year) limitations period; (ii) irreconcilable with the FLSA's remedial purposes because they required the employee to bear his or her own attorney's fees, as compared to the FLSA's fee-shifting provision for successful plaintiffs; and (iii) procedurally unconscionable because Fried Stewed Nude procured employee signatures through misleading statements, material omissions, and coercive strong-arm tactics.

[5]     As a key passage of the December 3 Order explained, "Simply put, the Opt-Ins and Fried Stewed Nude clearly and unmistakably agreed to submit to the arbitrator any disputes concerning arbitrability (including those bearing on the existence, scope and validity of the Agreements). … Accordingly, the Court does not reach the merits of plaintiffs' unconscionability objections.  Instead, the Court will enforce the parties' clear and unmistakable agreement that the arbitrator shall resolve arbitrability objections and decide the existence, scope or validity of the arbitration agreement."  (Doc. 82, at 9-10 (footnote omitted).)

claims lifted) based on an arbitrator's determination that the Employment Arbitration Agreement is not binding on him or her, or that it is not enforceable as to the instant dispute.[6]

### C.   Nature of Relief Sought by Plaintiffs' Motions.

The named plaintiffs (Raven Williams. D'Andre Wilkerson, Tiffany Newburn, Danielle Powe and Jennifer Hampton) have come forward with a pair of motions through which they seek conditional certification of this case as an FLSA collective action, court-facilitated notice to potential plaintiffs, and curative measures to correct for what plaintiffs characterize as "the harm of Defendants' conduct" with respect to the roll-out, implementation and execution of the Employment Arbitration Agreements.  (Doc. 78, at 1.)  As to conditional certification, plaintiffs propose the following class definition:

> "[A]ll current and former employees, including servers, of the Wintzell's Oyster House restaurants located in Downtown Mobile, Saraland, and West Mobile who were paid a cash wage less than minimum wage (excluding any credit for tips retained), or for whom Defendants claimed a 'tip credit' while requiring employees to contribute a portion of their tips to bussers, dishwashers, and/or other non-tipped employees from March 6, 2012 through March 6, 2015."

(Doc. 65, at 2.)  With regard to notice, plaintiffs "request that the Court include a curative instruction approved for use in alerting potential class members of their right to opt-in …. This curative instruction is necessary to counteract the retaliation and misleading information Defendants have and are communicating to their employees."  (Doc. 78, at 18.)  Plaintiffs propose not only that notice be mailed to putative opt-in plaintiffs, but also that defendants be ordered to "post the notice letter in its entirety in the common areas or at the time clocks of each of [their] facilities."  (Id.)

The appropriate analytical starting point is whether conditional certification of this action is appropriate at this time.  If so, the Court will move on to address whether court-facilitated notice is warranted and, if so, what the form, contents and methodology of such notice should be.

---

[6]   To be clear, the Court is in no way handicapping, predicting or forecasting any particular outcome to plaintiffs' forthcoming arbitration challenges to the Agreements on theories of procedural and substantive unconscionability.  Rather, the Court is merely recognizing the near-certainty that such challenges will be raised and the possibility that an arbitrator may find them to have merit, thereby restoring one or more of these individuals to active plaintiff status in this case, notwithstanding his or her execution of the Fried Stewed Nude Employment Arbitration Agreement in March 2015.

II.     **Analysis.**

    A.     *Conditional Certification under the FLSA.*

        1.     *Legal Framework.*

Pursuant to Section 216(b) of the FLSA, an action to recover unpaid minimum wages "may be maintained against any employer … by any one or more employees for and in behalf of himself or themselves **and other employees similarly situated**." 29 U.S.C. § 216(b) (emphasis added). In contrast to the traditional Rule 23 framework in which similarly situated persons' interests may be litigated without their formal consent, the FLSA features an opt-in mechanism for similarly situated employees. *See id.* ("No employee shall be a party plaintiff to any such action **unless he gives his consent in writing to become such a party** and such consent is filed in the court in which such action is brought.") (emphasis added); *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 950 n.3 (11th Cir. 2007) ("Unlike class actions governed by Rule 23 …, FLSA collective actions require potential class members to notify the court of their desire to opt in to the action."). Plaintiffs have consistently labeled this case as an FLSA collective action from its inception (*see* doc. 4), and now seek conditional certification under § 216(b). "The sole consequence of conditional certification is the sending of court-approved written notice to employees, … who in turn become parties to a collective action only by filing written consent with the court, § 216(b)." *Genesis Healthcare Corp. v. Symczyk*, --- U.S. ----, 133 S.Ct. 1523, 1530, 185 L.Ed.2d 636 (2013); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) ("If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.'").

The Eleventh Circuit has emphasized that "[t]he key to starting the motors of a collective action is a showing that there is a similarly situated group of employees." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008); *see also Anderson*, 488 F.3d at 952 ("To maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated.") (citations and internal quotation marks omitted). Thus, before authorizing notice to prospective plaintiffs, a "district court should satisfy itself that there are other employees … who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach v. State of Florida Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). In making these determinations at the conditional certification stage, the district court is to use "a fairly lenient standard, [which]

typically results in 'conditional certification' of a representative class." *Hipp*, 252 F.3d at 1218 (citation omitted); *see also Anderson*, 488 F.3d at 953 ("at the initial stage, courts apply a 'fairly lenient standard' for determining whether the plaintiffs are truly similarly situated") (citations omitted); *Kerce v. West Telemarketing Corp.*, 575 F. Supp.2d 1354, 1358 (S.D. Ga. 2008) ("Typically, courts presented with motions to conditionally certify a class under § 216(b) grant those motions and allow the case to proceed to discovery.").[7]  Granting conditional certification is very much the norm, and denying it is very much the exception.

"[U]ltimately, whether a collective action is appropriate depends largely on the factual question of whether the plaintiff employees are similarly situated to one another." *Morgan*, 551 F.3d at 1262.  The wrinkle is that neither Congress nor the Eleventh Circuit has precisely defined "similarly situated" in the context of a motion for conditional certification.  *See id.* at 1259 ("The FLSA itself does not define how similar the employees must be before the case may proceed as a collective action.  And we have not adopted a precise definition of the term.").  Nonetheless, lower courts performing the "similarly situated" inquiry at the conditional-certification stage of an FLSA action have considered the following factors, among others, to evaluate whether plaintiffs have met their burden: "(1) whether plaintiffs held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether plaintiffs were subjected to the same policies and practices, … established in the same manner and by the same decision maker; and (5) the degree to which the actions constituting the claimed violations are similar." *Pena v. Handy Wash, Inc.*, 28 F. Supp.3d 1289, 1296 (S.D. Fla. 2014) (citation omitted).

---

[7]      Of course, the conditional certification stage is not the only juncture in a FLSA collective action when a "similarly situated" determination may be made.  If a class is conditionally certified, then the district court may be called upon to revisit the "similarly situated" issue after discovery is complete and the matter is ready for trial, if defendants move for decertification.  "At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Hipp*, 252 F.3d at 1218 (citation omitted); *see also Morgan*, 551 F.3d at 1261 (at second stage, "the district court has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity").  "The 'similarly situated' standard at the second stage is less 'lenient' than at the first, as is the plaintiffs' burden in meeting the standard." *Anderson*, 488 F.3d at 953.

At this stage, "[a] plaintiff has the burden of showing a 'reasonable basis' for his claim that there are other similarly situated employees." *Morgan*, 551 F.3d at 1260. The Eleventh Circuit characterizes the legal standard for determining similarity at the conditional-certification stage as being "not particularly stringent, … fairly lenient, … flexible, … not heavy, … and less stringent than that for joinder under Rule 20(a) or for separate trials under 42(b)." *Id.* at 1261 (citations and internal marks omitted); *see also Beecher v. Steak N Shake Operations, Inc.*, 904 F. Supp.2d 1289, 1297 (N.D. Ga. 2012) (although "[p]laintiffs bear the burden of establishing that they are similarly situated with the group of employees they wish to represent," that burden "is not heavy" at the conditional-certification stage) (citations omitted); *Longcrier v. HL-A Co.*, 595 F. Supp.2d 1218, 1242 (S.D. Ala. 2008) ("The law erects only a low hurdle for FLSA plaintiffs seeking to obtain conditional class certification and court-facilitated notice to potential class members.").[8]

## 2. *Plaintiffs' "Similarly Situated" Showing.*

As noted, plaintiffs' burden at the conditional-certification stage is to demonstrate a "reasonable basis for [their] claim that there are other similarly situated employees." *Morgan*, 551 F.3d at 1260 (citations and internal quotation marks omitted). Here, plaintiffs show that the three Wintzell's Oyster House restaurant locations (Downtown Mobile, Saraland, and West Mobile) where conditional certification is sought have all been owned by the same entity, Fried Stewed Nude, Inc., since November 5, 2012. (R. Omainsky Decl. (doc. 59, Exh. A), ¶ 4.)

---

[8]     The parties devote a non-trivial portion of their briefs to debating whether Fried Stewed Nude's tip pool operated in a manner that did or did not violate the FLSA. Such discussions are largely unilluminating, because conditional-certification determinations must be made without regard to (and independently of) the merits of the case. *See, e.g., Longcrier*, 595 F. Supp.2d at 1241 ("The Court understands and appreciates HL-A's position that it has fully complied with its FLSA overtime obligations …. But now is not the time to evaluate the ultimate merits of the causes of action joined in the Amended Complaint, as those findings would have little bearing on the propriety of a threshold conditional class certification."); *Pena*, 28 F. Supp.3d at 1300 ("a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated"); *Kerce*, 575 F. Supp.2d at 1358 ("In considering a motion to conditionally certify the class in a wage and hour dispute, the Court does not reach the merits of the case."). Accordingly, insofar as either side would present arguments concerning the strength or weakness of the "invalid tip pool" theory underlying plaintiffs' FLSA cause of action, the Court declines to consider those matters in deciding the Motion for Conditional Certification and Court-Facilitated Notice.

Plaintiffs also show that servers at all three locations have received $2.25 per hour plus tips, have been notified that Fried Stewed Nude will take a tip credit to ensure they receive minimum wage for all hours worked, and have been required to contribute to a tip pool devised and administered in an identical manner at each location. (*Id.*, ¶¶ 28-32; Dyer Decl. (doc. 30, Exh. 1), ¶ 3; Curry Decl. (doc. 30, Exh. 4), ¶ 3.) Plaintiffs' litigation position, of course, is that Fried Stewed Nude operated this "tip pool" arrangement in an invalid manner by requiring servers at each location to share tips with non-tipped employees.

The "similarly situated" status of servers at the Downtown Mobile, Saraland and West Mobile restaurant locations during the relevant time period is reinforced by evidence that defendants conducted identical, mandatory meetings at each of the three locations in March 2015, to roll out the Fried Stewed Nude Employment Arbitration Agreement. (R. Omainsky Decl., ¶¶ 41-42.) During each meeting, management read from the same "script" delineating Fried Stewed Nude's policies, mission statements, and programs, all of which were uniform for all three locations. (*Id.*, ¶ 42.) Again, this evidence suggests that Fried Stewed Nude treated servers at all three locations the same (or, at least, in a substantially similar manner) with regard to the compensation practices at the heart of this litigation.

Based on plaintiffs' showing that Fried Stewed Nude utilized uniform tip pool policies and practices at the three locations during the relevant time period, and that such policies and practices applied to all servers at those locations, the Court readily concludes that plaintiffs have met their fairly lenient burden. Specifically, plaintiffs have made a reasonable showing that all servers who worked at the three subject Wintzell's Oyster House restaurant locations between November 5, 2012 (the date that Fried Stewed Nude purchased the restaurants) and March 6, 2015 (the date that plaintiffs filed their Complaint) are similarly situated. Moreover, plaintiffs have filed numerous "Consent to Join Forms" signed by would-be opt-in plaintiffs, including most recently Thomas Card, a server at the Downtown Mobile location whose form was dated January 4, 2016. (*See* doc. 86.) These opt-in plaintiffs are complaining about the same pay policy, practice, or scheme (*i.e.*, mandatory contributions to a tip pool for the benefit of non-tipped employees) by Fried Stewed Nude, resulting in the same purported FLSA violations (*i.e.*, disqualification of Fried Stewed Nude's eligibility for the tip credit, meaning that plaintiffs received sub-minimum-wage cash wages, all in violation of the FLSA) during the same time period. On this factual showing, the Court concludes that plaintiffs have met their modest

burden of establishing the existence of a similarly situated group of employees by showing that the prospective class members are all victims of a singular policy.[9]

### 3.    Defendants' Objections.

Notwithstanding the foregoing, defendants balk that the "similarly situated" prerequisite for FLSA conditional certification is not satisfied here.  In particular, defendants assert the following arguments: (i) plaintiffs have not shown that any employee of the West Mobile location desires opt-in status in this case; (ii) the arbitration agreements signed by many (but not all) Fried Stewed Nude servers negate "similarly situated" status; and (iii) there are no "similarly situated" employees for the time period from March 5, 2012 through November 5, 2012.  Each contention will be addressed in turn.

### a.    West Mobile Location Employees and Desired Opt-In Status.

First, defendants posit that plaintiffs have not met their burden of showing "similarly situated" employees because all opt-in plaintiffs identified to date are or were employed at the Downtown Mobile or Saraland locations, not the West Mobile location.  On that basis, defendants insist that "the Court should not authorize notice as to any unrepresented location." (Doc. 59, at 19.)  It is true enough that, in this Circuit, part of the "similarly situated" inquiry is whether "there are other employees of the [employer] who desire to 'opt-in.'"  *Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1244 (11th Cir. 2003) (citation omitted). However, defendants identify no reasoned authorities adopting an irreducible requirement that plaintiffs must establish on a facility-by-facility basis the existence of other employees desiring to opt-in.  More to the point, imposing such a stringent, hard-and-fast mandate would appear incompatible with the lenient, flexible FLSA standard for conditional certification.  It would conflict with numerous persuasive authorities not requiring evidence of similarly situated plaintiffs at each and every location in the proposed class.[10]  And it would create unreasonable

---

[9]      *See generally Longcrier*, 595 F. Supp.2d at 1241 ("The critical inquiry for defining the scope of the class is whether all included prospective class members are similarly situated, meaning that they are all collectively victims of a single policy or plan."); *PAL v. Sandal Wood Bar N Grill*, 2015 WL 237226, *1 (S.D.N.Y. Jan. 15, 2015) ("The plaintiff's burden at this preliminary stage is low, requiring only a 'modest factual showing' that they were victims of a common policy violating the law.").

[10]      *See, e.g., Johnson v. VCG Holding Corp.*, 802 F. Supp.2d 227, 236 (D. Me. 2011) ("While the named plaintiffs **need not demonstrate the existence of similarly situated persons at** (Continued)

practical obstacles to FLSA conditional certification via a "chicken and egg" problem forcing plaintiffs "to produce the very information that they sought to obtain through conditional certification and notice. … [A]n overly rigid and inflexible analysis risks the creation of a Catch-22 wherein Plaintiffs need to identify and notify members of the putative class before seeking a court order to allow for identification and notification." *Johnson v. VCG Holding Corp.*, 802 F. Supp.2d 227, 238 (D. Me. 2011) (citations omitted).[11]

In applying the "similarly situated" test to a putative class that would include multiple facilities, courts typically focus on whether plaintiffs have shown common ownership and uniform policies or practices across those establishments.[12]  Plaintiffs here have done so, via

---

*every location in the proposed class*, they must demonstrate that there existed at least one similarly situated person at a facility other than their own.") (emphasis added, citations and internal marks omitted); *Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530, 537 (N.D. Cal. 2007) (same); *Albanil v. Coast 2 Coast, Inc.*, 2008 WL 4937565, *6 (S.D. Tex. Nov. 17, 2008) (plaintiffs satisfy light burden by providing "at least a minimal basis for their assertions that other chippers would wish to join the lawsuit if they knew of it"); *Allen v. McWane, Inc.*, 2006 WL 3246531, *3 (E.D. Tex. Nov. 7, 2006) ("Although the affidavits and declarations do not encompass all of the Defendant's facilities, the Court finds that the Plaintiffs have come forward with competent evidence that similarly situated potential plaintiffs exist.  The evidence is sufficient to meet the lenient standard for giving notice to potential class members.").

[11]    *See also Rossello v. Avon Products, Inc.*, 2015 WL 3890403, *13 (D.P.R. June 24, 2015) ("Often, as here, a plaintiff moving for conditional certification hopes to obtain from the defendant the identities and contact information of every member of the proposed class; with this information in hand, the plaintiff can disseminate court-approved notice, the purpose of which is to determine whether any class members want to join the suit."); *Detho v. Bilal*, 2008 WL 2962821, *3 (S.D. Tex. July 29, 2008) (opining that "[t]here is a potential for a 'chicken and egg' problem in applying this factor, which this court recognized and took steps to avoid," and stressing importance of flexibility in assessing whether others are interested in joining the suit).

[12]    *See, e.g., Yap v. Mooncake Foods, Inc.*, --- F. Supp.3d ----, 2015 WL 7308660, *6 (S.D.N.Y. Nov. 18, 2015) ("With respect to certification across multiple retail locations, courts consider whether the plaintiffs have made an adequate factual showing to support an inference that … a uniform policy or practice exists, and whether the locations share common ownership or management.") (citation and internal quotation marks omitted); *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 486 (S.D. Ohio 2014) (plaintiff met conditional certification burden by showing "unlawful pay practices at each of the restaurant locations identified in the Complaint, at about the same time and place, in generally the same manner, which affected Plaintiff and the putative class members in the same way," where the challenged "pay practices and procedures are in place at the restaurants the Defendants own and operate"); *Perez v. Prime Steak House* (Continued)

evidence that Fried Stewed Nude owned all three of the locations (Downtown Mobile, Saraland, West Mobile) for which conditional certification is sought, and that other servers (or former servers) at two of those locations (Downtown Mobile, Saraland) are interested in joining this litigation to challenge what plaintiffs contend is an invalid tip pool and corresponding FLSA minimum wage violations flowing from precisely the same Fried Stewed Nude policy and practice that is common to all three restaurants.[13]  Under the circumstances of this case, and for the reasons stated, the Court has "satisf[ied] itself that there are other employees of [Fried Stewed Nude] who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions."  *Dybach*, 942 F.2d at 1567-68.  Accordingly, plaintiffs have met their burden.

---

*Restaurant Corp.*, 959 F. Supp.2d 227, 231 (D.P.R. 2013) ("For a class to extend beyond the named plaintiffs' own work location, [the plaintiffs] must demonstrate that 'employees outside of the work location for which the employee has provided evidence' were similarly affected by the employer's policies.") (citations omitted).

[13]      To be sure, defendants also object that the question of the tip pool's validity "is highly fact-specific and dependent upon the restaurant location, shift and time period a server worked." (Doc. 81, at 4.)  The gist of defendants' argument is that this case is really about servers sharing tips with "bussers," whose duties at Fried Stewed Nude are highly variable and may include washing dishes.  (R. Omainsky Decl., ¶¶ 29-31.)  But plaintiffs say this case is about dishwashers.  Their Complaint specifically pleads that "servers were required to give up a portion of their tips to dishwashers." (Doc. 4, ¶ 28.)  Plaintiffs submit evidence that they were forced to participate in a tip pool that included employees who "function[] solely as a dishwasher, working in the dishroom for the whole shift." (Dyer Decl., ¶ 5; Curry Decl., ¶ 5.)  And plaintiffs also point to defendants' evidence that precisely the same tip pool policy was in place at all three Fried Stewed Nude restaurants.  (R. Omainsky Decl., ¶¶ 29-31.)  The pleadings and declarations are sufficient to satisfy plaintiffs' light burden of showing that the servers at all three Fried Stewed Nude locations are similarly situated for purposes of application of defendants' uniform tip pool policy.  Should evidence in discovery reveal substantial, systematic and material differences in the duties of employees sharing in the bounty of the tip pool, which might make the tip pool's validity hinge on which restaurant a particular plaintiff worked in or to which shift he or she was assigned, then defendants are of course free to move for decertification after discovery is substantially complete.  For now, however, plaintiffs' pleadings and declarations contain ample evidence that all putative class members were subjected to the same challenged tip pool policy and that the policy functioned in the same way and was subject to the same purported legal defects at all three locations.

b.      *Effect of the March 2015 Arbitration Agreements.*

Second, defendants assert that the Fried Stewed Nude Employment Arbitration Agreement signed by 75 servers at the three subject locations in March 2015 necessitates denial of conditional certification.  In defendants' words, putative opt-in plaintiffs who have signed the Agreement "are simply not similarly situated to Plaintiffs who have not signed those same agreements."  (Doc. 81, at 2-3.)  Defendants' position (for which they cite no direct authorities) is undermined by considerable case law to the contrary.  Indeed, district courts have routinely (i) declined to address arbitration issues in adjudicating motions for FLSA conditional certification, and (ii) determined that the execution of arbitration agreements by certain prospective opt-in plaintiffs does not deprive them of "similarly situated" status vis a vis named plaintiffs who did not sign such agreements.  *See, e.g., Romero v. La Revise Associates, L.L.C.*, 968 F. Supp.2d 639, 647 (S.D.N.Y. 2013) ("courts have consistently held that the existence of arbitration agreements is 'irrelevant' to collective action approval 'because it raises a merits-based determination'") (citations omitted).[14]  The "similarly situated" inquiry under the FLSA turns on

---

[14]      *See also Woods v. Club Cabaret, Inc.*, --- F. Supp.3d ----, 2015 WL 6444793, *5 (C.D. Ill. Sept. 28, 2015) ("any issues related to opt-in plaintiffs with arbitration agreements can be addressed at step-two of the class certification process," not at conditional certification stage); *Guzman v. Three Amigos SJL Inc.*, --- F. Supp.3d ----, 2015 WL 4597427, *8 (S.D.N.Y. July 30, 2015) ("Nor does the fact that some of the contracts have arbitration provisions, simplified or not, create any differences between plaintiffs and other entertainers with respect to whether defendants violated the FLSA."); *Maddy v. General Elec. Co.*, 59 F. Supp.3d 675, 685 n.7 (D.N.J. 2014) ("That some service technicians have signed arbitration agreements does not preclude conditional certification of all service technicians across the United States."); *Salomon v. Adderly Industries, Inc.*, 847 F. Supp.2d 561, 565 (S.D.N.Y. 2012) (explaining that the "relevant" issue for conditional certification "is not whether Plaintiffs and [potential opt-ins] were identical in all respects, but rather whether they were subjected to a common policy to deprive them of overtime pay") (citation and internal quotation marks omitted); *Davis v. NovaStar Mortg., Inc.*, 408 F. Supp.2d 811, 818 (W.D. Mo. 2005) ("courts have certified collective actions even though putative class members have executed arbitration agreements"); *Villatoro v. Kim Son Restaurant, L.P.*, 286 F. Supp.2d 807, 811 (S.D. Tex. 2003) ("Defendant, further, raises issues about the effect of … newly signed arbitration/release agreements.  Most, if not all of these objections, go to the merits of the action or the forum in which these claims ultimately should be resolved, not whether notice to potential claimants should be given."); *Bowman v. Doe Run Resources Corp.*, 2014 WL 3579885, *5 (E.D. Mo. July 21, 2014) (quoting with approval authorities holding that "the existence of arbitration agreements is irrelevant to class certification") (citations omitted); *Amrhein v. Regency Management Services, LLC*, 2014 WL 1155356, *10 (D. Md. Mar. 20, 2014) ("the potential for arbitration will not forestall the
(Continued)

whether putative class members were all subject to the same allegedly violative pay practices, not whether their employer's merits defenses are precisely the same for all class members' efforts to vindicate their FLSA rights in federal court. The Court therefore rejects defendants' assertion that the 75 servers who signed Arbitration Agreements are thereby rendered dissimilar from the named plaintiffs for purposes of a FLSA conditional certification analysis.

That said, those Arbitration Agreements will of course affect the mechanics of this action going forward. As noted, the December 3 Order concluded that seven opt-in plaintiffs who had signed such Agreements must submit their claims (including arbitrability objections) to mediation and, if necessary, arbitration. Significantly, rather than dismissing those claims, the December 3 Order stayed them because, among other reasons, (i) the opt-in plaintiffs raise threshold challenges to enforceability of the Agreements that an arbitrator might resolve in their favor, thereby allowing them to rejoin this litigation without ever having the merits decided in arbitration; and (ii) dismissing their claims at this time would implicate statute-of-limitations concerns. (Doc. 82, at 11.)

The December 3 Order's reasoning and result illuminate the proper path for handling the claims of additional opt-in plaintiffs who signed FSN's Agreement. As both the Supreme Court and defendants recognize, conditional certification "does not produce a class with an independent legal status, or join additional parties to the action," but merely results in "the sending of court-approved written notice to employees, … who in turn become parties to a collective action only by filing written consent." *Genesis Healthcare*, 133 S.Ct. at 1530. By signing the Agreement, putative opt-in plaintiffs did not forfeit the right to receive notice of this litigation or to pursue FLSA claims against Fried Stewed Nude and Omainsky; rather, they merely agreed to a different forum and procedure for resolving such disputes. Therefore, these

---

Plaintiffs' entitlement to conditional certification"); *Nesselrodte v. Underground Casino & Lounge, LLC*, 2012 WL 4378163, *4 (N.D. W.Va. Sept. 25, 2012) ("the FAA does not forbid the Court from granting *conditional* certification for a collective action class under the FLSA based upon a relatively small group of the potential class signing an agreement to arbitrate any claims arising against the employer"); *Pontius v. Delta Financial Corp.*, 2005 WL 6103189, *4 (W.D. Pa. June 24, 2005) ("Nor should employees be excluded at this early stage because they … have signed agreements containing arbitration clauses. Rather, notice and an opt-in opportunity should be broadly given ….").

individuals are properly afforded notice just like all other prospective class members.  The difference is that when plaintiffs who have signed the Fried Stewed Nude Employment Arbitration Agreement opt-in, defendants may move to compel mediation/arbitration of their claims.  Upon such an occurrence, the claims of those opt-in plaintiffs will be stayed and referred to mediation/arbitration, just as those of opt-in plaintiffs Booth, Wade, Odom, Henry, Guess, Lord and Smith were via the December 3 Order.  By allowing those individuals to opt-in and then staying their claims, the Court enables these prospective class members to toll the statute of limitations.[15]  This course of action will also create a marker, a placeholder as it were, for these opt-in plaintiffs' claims in the event that the arbitrator may decide threshold arbitrability issues in their favor and return their claims to federal court.  In short, while opt-in plaintiffs who have signed Agreements will have their claims processed differently than those of class members who have not, the existence of such Agreements neither negates the propriety of conditional certification nor renders these putative opt-in plaintiffs ineligible to receive notice or file consents to join, subject to defendants' right (if they so choose) to move to enforce the mediation/arbitration provisions.[16]

c.      *Temporal Boundaries of Class Definition.*

Third, defendants object that the proposed class definition is temporally inappropriate.  Once again, plaintiffs seek conditional certification of a class of servers at Wintzell's Oyster House restaurants in Downtown Mobile, Saraland, and West Mobile who were paid below minimum wage or for whom defendants claimed a tip credit "from March 6, 2012 through March

---

[15]     *See, e.g., Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996) (through § 216(b), "Congress also incorporated the principle that only a written consent to opt-in will toll the statute of limitations on an opt-in plaintiff's cause of action"); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 260 (S.D.N.Y. 1997) ("only by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled").

[16]     In so concluding, the Court is persuaded by plaintiffs' reasoning that "Defendants' argument regarding arbitration is best characterized as an affirmative defense, seeking to compel arbitration in response to prospective claims of opt-in plaintiffs not actually yet before this Court. … Opt-ins who signed the arbitration agreements should be allowed to file a consent form.  If Defendants choose to compel mediation/arbitration, then the Court can stay the proceedings for those individuals in the same manner."  (Doc. 84, at 3, 6-7.)

6, 2015." (Doc. 65, at 2.)  The rub, defendants say, is that Fried Stewed Nude did not even own the subject restaurant locations until November 5, 2012.

This objection is sound.  As the parties are well aware, plaintiffs initially named as an additional defendant an entity called Wintzell's, Inc., but reached a settlement with that defendant in November 2015.  Settlement papers jointly filed by plaintiffs and Wintzell's, Inc. confirm the following pertinent facts: (i) "Wintzell's, Inc. and [Fried Stewed Nude] are unrelated licensees of the Wintzell's Oyster House brand;" (ii) defendant Robert W. Omainsky "is the President of FSN;" (iii) Wintzell's, Inc. sold the Downtown Mobile, Saraland and West Mobile restaurants to Fried Stewed Nude on November 5, 2012; and (iv) after November 5, 2012, "all employees of those restaurants have been employed by FSN, not Wintzell's, Inc."  (Doc. 69, ¶ 2.)  As part and parcel of their settlement, plaintiffs agreed to "withdraw and discontinue attempts to conditionally certify a class affecting Wintzell's, Inc. or involving claims or remedies against Wintzell's, Inc."  (*Id.*, ¶ 7(b).)  Thus, in court filings in this case, plaintiffs have acknowledged that the remaining defendants (Fried Stewed Nude and Omainsky) did not purchase the subject restaurant locations or employ the workers there until November 5, 2012. So why, then, do plaintiffs seek conditional certification of a class of servers at those restaurants for a period that includes the span of March 6, 2012 through November 5, 2012, when Fried Stewed Nude and Omainsky did not own those locations?  Plaintiffs do not say.  This course of action is especially curious given that plaintiffs have settled, compromised and otherwise withdrawn their claims against the entity that they acknowledge did own the restaurants during that period.[17]

Viewing this concern in the context of plaintiffs' burden at the FLSA conditional certification stage, the Court readily concludes that plaintiffs have failed to show a reasonable basis for their contention that servers at the Wintzell's locations in Downtown Mobile, Saraland

---

[17]     The Court cannot discern whether plaintiffs' inclusion of the March 6, 2012 through November 5, 2012 period in their proposed class definition was a mere oversight or whether there was some deliberate, reasoned basis for it.  At any rate, plaintiffs never disclosed any such reasoning, leaving the undersigned and opposing counsel guessing as to whether they actually intended to utilize these dates in the wake of the Wintzell's, Inc. settlement and, if so, why.  On its face, certifying a class including a temporal span when the named defendants did not own the restaurants, and when they were owned by an entity as to which plaintiffs have settled or withdrawn their claims in full, would appear both improvident and counterproductive.

and West Mobile from March 6, 2012 through November 5, 2012 are similarly situated to servers at those same locations from November 5, 2012 through March 6, 2015.  By plaintiffs' own admission, servers during the earlier time period did not work for the named defendants in this case, whereas those during the later period did.  Plaintiffs identify no facts or legal theory through which Fried Stewed Nude or Omainsky might be held liable under the FLSA for alleged minimum-wage violations at Wintzell's locations occurring before they ever purchased those locations, particularly where plaintiffs have already settled their claims against the entity that did own those Wintzell's locations during that earlier period.  Simply put, how can potential opt-in plaintiffs be similarly situated to the named plaintiffs for the period of March 6, 2012 through November 5, 2012 when the named plaintiffs have received full compensation and/or withdrawn their FLSA claims against the restaurant owner during that time period?[18]  Again, plaintiffs do not say.

      In short, plaintiffs have failed to make even a modest showing that servers at the subject restaurants from March 6, 2012 through November 5, 2012 are similarly situated to the servers that worked there from November 5, 2012 going forward.  Thus, that earlier time period is properly excluded from the class definition.  While the Court grants plaintiffs' Motion for Conditional Certification, the class definition will be narrowed to cover only the time period from November 5, 2012 through March 6, 2015.

---

[18]       To sharpen this point, plaintiffs have admitted that the only named plaintiff who worked for Wintzell's, Inc. prior to Fried Stewed Nude's purchase of the restaurants was Tiffany Newburn.  (Doc. 69, ¶ 3.)  Plaintiffs have further admitted that, pursuant to the settlement in this case, Wintzell's, Inc. paid plaintiff Newburn the full amount of back pay that she claimed for the time period that she worked for Wintzell's, Inc., plus an equal amount in liquidated damages and an attorney's fee allowance.  (Doc. 76, ¶ 16.)  Thus, plaintiff Newburn has now been paid in full for any FLSA tip-credit violations that occurred during the period of March 6, 2012 through November 5, 2012.  So Newburn can have no remaining valid FLSA tip-credit claims against anyone for that period because, again, she has already been paid in full.  And plaintiffs admit that no other named plaintiff worked at the subject restaurant locations during the March 6, 2012 to November 5, 2012 period.  So the named plaintiffs are not similarly situated to prospective opt-in plaintiffs who did work at the Downtown Mobile, Saraland and West Mobile locations during that period because the named plaintiffs worked for a different entity at a different time, and have no outstanding claims against anybody based on invalid tip pools during that time period.

## B.     *Court-Facilitated Notice and Contents/Form of Same.*

In addition to requesting conditional certification of this FLSA collective action, plaintiffs move for court-facilitated notice.  It has long been recognized that the FLSA's broad remedial purpose "is best served if the district court is deemed to have the power to give such notice to other potential members of the plaintiff class to 'opt-in' if they so desire and by the district court's exercise of that power under appropriate conditions."  *Dybach*, 942 F.2d at 1567.[19]  As the Supreme Court has explained, "[b]ecause trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time."  *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).  "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed."  493 U.S. at 172.  Particularly in light of the parties' strident disagreement about certain notice-related issues, the Court exercises its authority in favor of court-facilitated notice here, in the interests of preventing misleading communications and ensuring that notice is timely, accurate and informative.

As noted, the parties do not see eye-to-eye about various aspects of the notice process. For starters, plaintiffs request that defendants be ordered to produce the "names, addresses, email addresses, last four digits of their Social Security numbers, and telephone numbers of potential opt-ins" (doc. 30, at 27) for notice purposes; however, defendants object to the request for Social Security numbers and telephone numbers (doc. 59, at 30).  Next, plaintiffs have proposed a form notice; however, defendants disagree with the contents of that form as to identification of counsel, disclosure of the burdens of litigation, description of the lawsuit and class, and omission of various defenses (doc. 59, at 30).  Further, plaintiffs request that, in addition to individual mailings, the notice be posted in common areas or at the time clocks of each restaurant location

---

[19]     Of course, before exercising such power, the district court "should satisfy itself that there are other employees of the department-employer who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions."  *Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1244 (11th Cir. 2003) (citation omitted).  The Court has done precisely that in the preceding pages.

(doc. 30, at 28); however, defendants object that such postings are unwarranted and intrusive (doc. 59, at 30).  Finally, plaintiffs have requested (via a separate 23-page Motion and 8-page Reply) that the notice include a "curative provision" "in order to correct the harm of Defendants' conduct" (docs. 78, 84); however, defendants object to any such remedial measures in a corresponding 10-page brief and exhibits (doc. 83).

The Court addresses these topics as follows:  With regard to the requested data, plaintiffs are entitled to receive – and defendants are obligated to provide – names and contact information for all potential class members.  *See, e.g., PAL v. Sandal Wood Bar N Grill*, 2015 WL 237226, *2 (S.D.N.Y. Jan. 15, 2015) ("In managing the notice process, courts routinely order employers to provide contact information for potential plaintiffs.").  Last known mailing addresses and telephone numbers have obvious utility to plaintiffs' efforts to track down and notify prospective opt-in plaintiffs.  However, plaintiffs have not shown that Social Security numbers are necessary for this enterprise, much less that the resulting incursion on employees' privacy is warranted.  *See, e.g., Woods v. Club Cabaret, Inc.*, --- F. Supp.3d ----, 2015 WL 6444793, *7 (C.D. Ill. Sept. 28, 2015) ("the last four digits of social security numbers would be of marginal use in locating potential plaintiffs and, whatever that marginal use might be, it is substantially outweighed by the privacy concerns of potential plaintiffs"); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp.2d 317, 324 (S.D.N.Y. 2007) (denying request for production of Social Security numbers of potential opt-in plaintiffs where "Plaintiff has provided no rationale to explain why he requires such extensive production of information"); *Sandal Wood*, 2015 WL 237226, at *2 (declining "to order disclosure of social security numbers where other means of identification are available, given the sensitivity of such information," particularly "absent a showing that other forms of identification will be insufficient").  Defendants' objection to plaintiffs' request for production of the last four digits of Social Security numbers of potential class members is **sustained**.

With respect to the method of notice, plaintiffs have requested that defendants be ordered to "post the notice letter in its entirety in the common areas or at the time clocks of each of [their] facilities."  (Doc. 30, at 28.)  Defendants object, on the theory that such postings would be "overly intrusive and should not be ordered absent evidence that mailing of notices is ineffective."  (Doc. 59, at 30.)  Upon consideration, the Court finds persuasive the line of authorities supporting defendants' position.  *See, e.g., Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 500-01 (D. Neb. 2009) (rejecting dissemination of notice via workplace posting

where "[t]here is no evidence personal mailing will be an unreliable means of delivering notice to the putative plaintiffs").[20]  Plaintiffs have presented no evidence, and there is no reason to believe, that transmission of notice to prospective class members via the methods authorized herein (U.S. Mail, telephone, e-mail) using employer-provided data will be inadequate to notify potential opt-in plaintiffs, or that posting of notice in the Fried Stewed Nude restaurants would serve a legitimate purpose, rather than amounting to an overreaching, duplicative distraction to defendants' business.  That said, plaintiffs may renew their request for notice via posting upon a specific showing that other forms of notice are defective or otherwise inadequate here.[21]

Third, with regard to the content of the notice, the parties have multiple areas of divergence.  However, rather than urging the Court to wade into the minutiae of the notice language, both sides propose that they be allowed to meet and confer to attempt to hammer out a

---

[20]  *See also Koehler v. Freightquote.com, Inc.*, 93 F. Supp.3d 1257, 1266 (D. Kan. 2015) ("Plaintiffs have presented no evidence or suggestion that posting the Notice would reach a wider audience than mailing the Notice would reach, and the potential class members that such a posting would reach are the same employees for whom defendant most likely has current home address information."); *Sandal Wood*, 2015 WL 237226, at *3 ("Since defendants will be required to provide plaintiffs with contact information for past and current employees, posting of notice at the restaurant is unnecessary at this stage.  Plaintiffs' request is denied without prejudice to renewal should other forms of notification prove ineffective."); *Barnett v. Countrywide Credit Industries, Inc.*, 2002 WL 1023161, *2 (N.D. Tex. May 21, 2002) ("The Court determines that mailing the notice to the potential class members, rather than also posting them at Defendants' offices, is sufficient to provide the potential opt-in plaintiffs with notice of the suit.").

[21]  Two other points on this topic bear mention.  First, the undersigned is aware that some courts have approved notice via posting as a "belt-and-suspenders" means of ensuring that employees are notified of their opt-in rights.  Under the particular circumstances of this case, however, and given the broad contact information that plaintiffs are already accessing (mailing addresses, telephone numbers, e-mail addresses), it is difficult to imagine how notice by posting will achieve anything other than redundancy and intrusion into defendants' work spaces.  Second, while plaintiffs would link their posting request to defendants' conduct of requesting that certain putative class members sign arbitration agreements in March 2015 (*see* doc. 30, at 28-29), such a nexus is tenuous at best.  Plaintiffs have not explained – and the Court does not perceive – why defendants' act of asking employees to sign arbitration agreements would render opt-in notice to those employees via U.S. Mail, telephone or e-mail less efficacious, much less why an additional type of notice via posting at a restaurant time clock would be reasonably necessary to maximize awareness of their opt-in rights.

mutually acceptable form of notice.[22]  This course of action is appropriate.  Pursuant to the parties' own expressed wishes, then, the Court directs the parties to meet and confer and make a good-faith effort to agree on the text of the proposed notice.

Fourth, the Court considers the parties' extensive briefing on plaintiffs' Motion for Curative Provision.  Plaintiffs posit that defendants engaged in misleading, deceptive, and coercive conduct in inducing some 75 servers at Fried Stewed Nude restaurants to execute Employment Arbitration Agreements in March 2015.  According to plaintiffs, defendants misled servers into thinking that signing the Agreement was mandatory, failed to disclose that they intended to utilize these Agreements to block servers from joining this lawsuit, failed to inform servers of their right to join a FLSA collective action, neglected to tell servers that they were surrendering rights under the FLSA, failed to give servers copies of relevant documents, and threatened retaliation if employees did not sign.  Plaintiffs also insist that the Agreements themselves are unlawful and invalid because they purport to abridge, waive or disclaim employees' rights under the FLSA.  Although plaintiffs do not delineate exactly what relief they seek, they frame it generally in the following terms:

> "Plaintiffs request that the Court include a curative instruction in any notice approved for use in alerting potential class members of their right to opt-in to the conditionally certified collective action in this matter.  This curative instruction is necessary to counteract the retaliation and misleading information Defendants have and are communicating to their employees.  If this Court finds the Arbitration Agreement unconscionable in any part, Plaintiffs also request that the curative instruction address that issue."

(Doc. 78, at 18.)

The overlap between plaintiffs' Motion for Curative Provision and their procedural and substantive unconscionability arguments presented in the context of defendants' Motion to Compel Mediation / Arbitration is striking and pervasive.  Via the December 3 Order, this Court has already held that, by the express terms of the Fried Stewed Nude Employment Arbitration Agreement, disputes as to the validity, scope and enforceability of same (which would

---

[22]     *See* doc. 59, at 31 ("Defendants request that the parties be permitted the opportunity to confer and agree on these issues and submit briefing on any areas of disagreement."); doc. 65, at 13 ("Plaintiffs request that they be allowed to confer with Defendants to devise a mutually agreeable notice and separately brief any particular issues upon which they are unable to agree.").

encompass all of plaintiffs' substantive and procedural unconscionability arguments) are reserved for the arbitrator, not a court, to decide.  Accordingly, it would be inappropriate for the Court to authorize or mandate inclusion in the notice any judicial findings concerning the validity or enforceability of the Agreements, or any judgment about the propriety of defendants' methodology in securing such Agreements.  By the clear terms of the contract and the December 3 Order, this Court will not pass judgment on those matters, at least in the first instance.  Insofar, then, as plaintiffs are seeking judicial endorsement of a "curative provision" that condemns or otherwise ascribes wrongdoing to defendants' conduct vis a vis the Arbitration Agreements, their request is **denied**.

Notwithstanding the foregoing, the Court agrees with plaintiffs that prospective opt-in plaintiffs would benefit from inclusion in the notice of general guidance reflecting that (i) execution of an Employment Arbitration Agreement does not bar them from filing a consent form, (ii) filing a consent form may toll the statute of limitations for certain claims they may have under the Fair Labor Standards Act, (iii) they may be compelled to mediate and (if necessary) arbitrate their claims if they file a consent form after signing an Employment Arbitration Agreement, and (iv) defendants are forbidden by law from retaliating against employees who file consent forms.  Alerting prospective opt-in plaintiffs to these principles is reasonably calculated to alleviate any confusion otherwise engendered by their signing of the Agreement and subsequent receipt of notice of opt-in rights in this case.  Such clarification stands to benefit everyone, including both the potential opt-ins and the existing parties to this lawsuit.  The Court leaves the precise language of these provisions to the parties' drafting and good-faith negotiations; however, plaintiffs' request that such concepts be embodied in the notice is **granted**.

### III.   Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.   Plaintiffs' Motion for Conditional Certification and Court-Facilitated Notice (doc. 30) is **granted in part**, and **denied in part**;

2.   The Court **conditionally certifies** a class consisting of all current and former employees, including servers, of the Wintzell's Oyster House restaurants located in Downtown Mobile, Saraland, and West Mobile who were paid a cash wage less than minimum wage (excluding any credit for tips retained), or for whom

Defendants claimed a 'tip credit' while requiring employees to contribute a portion of their tips to bussers, dishwashers, and/or other non-tipped employees, all for the period spanning November 5, 2012 through March 6, 2015;

3. Defendants' request that servers who signed the Fried Stewed Nude Employment Arbitration Agreement be excluded from the conditionally certified class is **denied**;

4. In accordance with the terms of this Court's Order (doc. 82) entered on December 3, 2015, upon the filing of a consent form by any opt-in plaintiff who did sign the Fried Stewed Nude Employment Arbitration Agreement, defendants may move to compel mediation/arbitration of that individual's claims. Any such motions will be summarily granted (without briefing), pursuant to the reasoning and conclusions of the December 3 Order, and the claims of any such affected opt-in plaintiff will be stayed and referred to mediation/arbitration;

5. Plaintiffs' requests that defendants be required to produce the last four digits of the Social Security numbers of all prospective class members, and that defendants be required to post notice inside each affected restaurant, are **denied**;

6. Defendants are **ordered**, on or before **February 18, 2016**, to produce a computer-readable data file containing the names, last known physical addresses, e-mail addresses, and telephone numbers of all potential opt-in plaintiffs within the scope of the conditionally-certified class described in item 2;

7. The parties are **ordered** to meet and confer and make a good-faith effort to resolve their disagreements on the terms and text of the proposed notice. On or before **February 11, 2016**, the parties must jointly submit a proposed form of notice for approval by this Court. Should any good-faith disputes remain regarding the contents of the notice, each party must contemporaneously submit a memorandum of law, **not to exceed ten (10) pages in length**, outlining the specific areas of disagreement, that party's proposals for remedying those disputes, and any supporting legal authorities;

8. Plaintiffs' Motion for Curative Provision in the Notice (doc. 78) is **granted in part**, and **denied in part**. The Motion is **denied** insofar as plaintiffs seek inclusion in the notice of judicial findings as to the procedural or substantive

unconscionability (or lack thereof) of the Employment Arbitration Agreement. The Motion is **granted** insofar as plaintiffs request that the notice include statements to the effect that (i) execution of the Agreement does not bar an opt-in plaintiff from filing a consent form, (ii) filing a consent form may toll the statute of limitations for an opt-in plaintiff's FLSA tip-credit claims, (iii) an opt-in plaintiff who previously signed the Agreement may be compelled to mediate and (if necessary) arbitrate his or her claims upon filing a consent form in this case, and (iv) defendants may not retaliate against anyone who files a consent form; and

9.     Defendants' Motion to Strike Plaintiffs' Reply (doc. 85) is **denied**.

DONE and ORDERED this 21st day of January, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE
